**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANDREA PIRROTTI, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:11-CV-00439 |
| v. | : | |
| | : | JANUARY 28, 2013 |
| RESPIRONICS, INC., | : | |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 126),**
**DEFENDANT'S MOTION TO SUBSTITUTE PAGES (Doc. No. 143), and**
**PLAINTIFF'S MOTION TO STRIKE EXHIBITS FROM SUMMARY JUDGMENT**
**MOTION (Doc. No. 152)**

**I.     INTRODUCTION**

Plaintiff, Andrea Pirrotti, brings this suit against Respironics, Inc. ("Respironics"),

alleging that Respironics engaged in a fraudulent asset transfer and demanding

enforcement of a prior judgment, punitive damages, and attorney's fees based on their

successor liability.[1]

Pirrotti originally filed her Complaint on March 22, 2011.  This court denied

Respironics' Motion to Dismiss on September 6, 2011 (Doc. No. 52).  On December 20,

2011, Pirrotti filed a Motion for Summary Judgment (Doc. No. 84).  The court denied

that Motion on April 9, 2012, in a Ruling issued on the record ("Pl.'s Summ. J. Ruling")

(Doc. No. 105).  On May 31, 2012, Respironics filed its own Motion for Summary

Judgment (Doc. No. 126) as to the claim against it.

For the reasons set forth below, Respironics' Motion for Summary Judgment is

**denied**.  Further, Respironics' Motion to Substitute Pages (Doc. No. 143) is **granted**.

Pirrotti's Motion to Strike Exhibits is **dismissed as moot** as the issue of the admissibility

---

[1] Pirrotti originally filed suit against Western Cape Direct, LLC as well.  On August 29, 2011, Pirrotti voluntarily dismissed all claims against Western Cape Direct, LLC.  See Doc. Nos. 47, 48.

of exhibits attached in support of a Motion for Summary Judgment is addressed within this Ruling on the Motion for Summary Judgment itself.

## II.    STANDARD OF REVIEW

A motion for summary judgment "may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." In re Dana Corp., 574 F.3d 129, 151 (2d Cir.2009). Thus, the role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. In making this determination, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 274 (2d Cir.2009).

"[T]he moving party bears the burden of showing that he or she is entitled to summary judgment." United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir.2009). Once the moving party has satisfied that burden, in order to defeat the motion, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed.R.Civ.P. 56(e)). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir.2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir.2007)); see also Havey v. Homebound Mortg., Inc.,

547 F.3d 158, 163 (2d Cir.2008) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)) (stating that a non-moving party must point to more than a mere "scintilla" of evidence in order to defeat a motion for summary judgment).

## III.   FACTUAL BACKGROUND

Helicor is a company that manufactured a product called the StressEraser, a sleep aid product.[2]  <u>See</u> Defendant's Memorandum in Support of Motion for Summary Judgment ("Def.'s Memo. Supp. Mot. Summ. J.") (Doc. No. 126-1) at 3; Plaintiff's Memorandum in Opposition to Motion for Summary Judgment ("Pl.'s Memo. Opp. Mot. Summ. J.") (Doc. No. 150) at 5.  The court takes judicial notice of an action filed by Pirotti against Helicor for breach of contract.  <u>See</u> <u>Pirrotti v. Helicor, Inc.</u>, 3:09-CV-231 (PCD) (D. Conn.).  Pirrotti, a former employee at Helicor, obtained a default judgment against Helicor in the amount of $76,710.00 on August 28, 2009.  <u>See</u> <u>id.</u> at Doc. No. 24.

At some point in the mid 2000's, a separate company, Respironics, became interested in Helicor and its products.  <u>See</u> Def.'s Memo. Supp. Mot. Summ. J. at 3; Pl.'s Memo. Opp. Mot. Summ. J. at 12.  The parties dispute much of the factual background concerning how and in what capacity Respironics became entwined with Helicor.

Respironics asserts that, as part of its overall investment in Helicor, it issued a $400,000 loan on June 16, 2008, to Helicor in exchange for a Secured Convertible Promissory Note for the same amount ("2008 Note").  <u>See</u> Defendant's Local Rule

---

[2] Local Rule of Civil Procedure 56(a) requires parties to submit statements attached to summary judgment pleadings that assert all undisputed and disputed issues of material fact in the case.  <u>See</u> D. Conn. L. Civ. R. 56(a).  As neither party satisfied its obligation to provide a comprehensive summary of material facts, the court draws many of these relevant facts from citations within the parties' memoranda in support of, or in objection to, the Motion for Summary Judgment.

56(a)1 Statement ("Def.'s 56(a)1") (Doc. No. 127) at ¶ 1.  Pirrotti asserts that the $400,000 loan was authorized and made by Koninklijke Philips Electronics NV ("Philips"), a third party that Pirrorri asserts was Respironics' corporate parent.  See Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s 56(a)2") (Doc. No. 151) at ¶ 1.

Respironics asserts that the 2008 Note was secured by a security agreement, a trademark security agreement, and a patent security agreement, which granted Respironics a lien and security interest in all of Helicor's physical assets and intellectual property.  See Def.'s 56(a)1 at ¶ 2,3.  Pirrotti asserts that no such agreements were in effect and no lien or security interest were operable because the loan had been authorized in an invalid manner.  See Pl.'s 56(a)2 at ¶ 2, 3.

On August 27, 2008, Respironics filed a Uniform Commercial Code Financing Statement with the Delaware Department of State, covering, inter alia, "[a]ll personal property, including, without limitation, the following . . . (ix) Goods; (x) Instruments, (xi) Copyrights, Copyright Licenses, Patents, Patent Licenses, Trademarks and Trademark Licenses; (xii) Inventory" in Helicor.  See Pl.'s 56(a)1 at ¶ 4; Def.'s 56(a)2 at ¶ 4.

The parties dispute whether or not Helicor defaulted on the 2008 Note.  See Def.'s 56(a)1 at ¶ 5; Pl.'s 56(a)2 at ¶ 5.  On June 15, 2009, Helicor's assets were sold, in two lots, at a live auction.  See Def.'s 56(a)1 at ¶ 6; Pl's 56(a)2 at ¶ 6.  The parties dispute the degree to which this sale was open to the public, and whether or not the sale was conducted by Reed Smith, LLP.  See Def.'s 56(a)1 at ¶ 6,7; Pl.'s 56(a) at ¶ 6,7.  The parties further dispute whether the value of the collateral allegedly secured by the 2008 Note was established at the auction of Helicor's assets and whether the value

of those assets exceeded the amount of Respironics' lien.  See Def.'s 56(a)1 at ¶ 8,9; Pl.'s 56(a)2 at ¶ 8,9.

The parties further dispute whether Respironics ever became the owner of the assets contained in Lot 1.  See Def.'s 56(a)1 at ¶ 10; Pl.'s 56(a)2 at ¶ 10.  Respironics asserts that a separate company, Western Cape, was the sole and winning bidder for Lot 1, which consisted of physical Helicor assets, with a winning bid of $100.  See Def.'s Memo. Supp. Mot. Summ. J. at 8.  It does not appear that Pirrotti disputes that Lot 1 was sold to Western Cape for $100, but Pirrotti does appear to dispute whether those assets first transferred to Respironics before being transferred to Western Cape.  See Pl.'s Memo. Opp. Mot. Summ. J. at 6.  Respironics purchased Lot 2, which consisted of Helicor's intellectual property, for the outstanding monies due under the 2008 Note, which totaled over $400,000.  See Def.'s Memo. Supp. Mot. Summ. J. at 8; Pl.'s Memo. Opp. Mot. Summ. J. at 6.

In a rare moment of non-disputation, the parties do agree that Respironics and Helicor have never shared office space and that Respironics has never been under the control of Helicor's management.  See Def.'s 56(a)1 at ¶ 11, 13; Pl.'s 56(a)2 at ¶ 11, 13. The parties do dispute whether Respironics ever utilized any of Helicor's physical assets, and further dispute whether Helicor has ever been under the control of Respironics' management.  See Def.'s 56(a)1 at ¶ 12, 14; Pl.'s 56(a)2 at ¶ 12, 14.

The parties further dispute whether Respironics adopted Helicor's business operations, assumed Helicor's liabilities, continued to develop, sell, or market the StressEraser, or used any of the intellectual property it acquired in Lot 2 of the June 15, 2009 sale to develop, market, or sell any products.  See Def.'s 56(a)1 at ¶ 15-17; Pl.'s

5

56(a)2 at ¶ 15-17.  The parties also dispute whether Respironics remains a corporation entirely separate and apart from Helicor, and whether Respironics dissolved, or had the authority to dissolve, Helicor.  See Def.'s 56(a)1 at ¶ 18-19; Pl.'s 56(a)2 at ¶ 18-19.

## IV.   DISCUSSION

In this case, Pirrotti claims that she is entitled to collect on the judgment she obtained against Helicor, from Respironics, because Respironics is Helicor's successor.

### A.   Successor Liability

The bases for successor liability in Connecticut were described by the district court in Ricciardello v. J.W. Gant & Co., 717 F. Supp. 56, 57-58 (D. Conn. 1989):

> Under the general rule, a corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

Numerous Connecticut courts have since adopted this standard.  See, e.g., Chamlink Corp. v. Merritt Extruder, 96 Conn. App. 183, 188 (Conn. App. Ct. 2006); see also Call Ctr. Techs., Inc. v. Grand Adventure Tour & Travel Publ'g Corp., 635 F.3d 48, 52 (2d Cir. 2011) (discussing Connecticut law).  Several Connecticut courts have also recognized a fifth exception, for "product line" continuity.  See, e.g., Kennedy Oshkosh Truck Corp., No. CV920510394S, 1995 WL 27400, at *2 (Conn. Super. Jan. 18, 1995).

Only the second, third, and fourth exceptions are relevant here, and the court will address each of them in turn.

#### 1.   Merger or Consolidation

In Connecticut, "[a] merger contemplates the absorption of one corporation by another which retains its name and corporate identity with the added capital, franchise

6

and powers of a merged corporation," while "[a] consolidation envisions the joining together of two corporations so that a totally new corporation emerges and the two others cease to exist." Ricciardello, 717 F. Supp. at 58.  Here, Pirrotti has presented no evidence, and does not appear to argue, that Helicor and Respironics entered into a formal merger agreement.  There is no evidence of a "plan of merger" as envisioned by Connecticut statute.  See Conn. Gen. Stat. § 33-815; Def.'s Memo. Supp. Mot. Summ. J. at 20.

However, a lack of a formal merger agreement is not necessarily fatal to Pirrotti's claim under the merger exception.  Instead, Pirrotti claims, a material issue of fact exists as to whether the transactions between Helicor and Respironics constituted a de facto merger between the two companies.  "A defacto merger occurs when a transaction, although not in form a merger, is in substance 'a consolidation or merger of a seller and purchaser.'"  Greystone Community Reinvestment Ass'n, Inc. v. Berean Capital, Inc., 638 F.Supp.2d 278, 289 (D. Conn. 2009) (quoting New York v. Nat'l Svc. Inds., Inc., 460 F.3d 201, 209 (2d Cir. 2006).  Courts consider four factors to determine whether a de facto merger has occurred:

> (1) Continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Id. (quoting Collins v. Olin Corp., 434 F.Supp.2d 97, 102 (D. Conn. 2006).  "All four of the common law factors need not be present in order for there to have been a de facto merger."  Yankee Gas Serv. Co. v. UGI Utilities, Inc., 852 F.Supp.2d 229, 246 (D. Conn.

2012).  "Under Connecticut law, not every one of these indicia must be established, but the court should apply more of a balancing test.  Analysis of the necessary factors should be undertaken in a flexible, realistic manner focusing on intent."  Greystone, 638 F.Supp.2d at 289 (internal quotations and citations omitted).

Respironics argues that none of these factors applies to the situation between Helicor and Respironics.  According to affidavit testimony of Shanan Shrieber, legal counsel for Respironics, Respironics did not assume any liabilities associated with Helicor's business,  Helicor's principals are in no way associated with Respironics, and the two companies share no management, personnel, physical location, assets, or general business operation.  See Def.'s 56(a)2 at ¶ 10-15.  Further, Respironics asserts, in Shriber's Affidavit, that Helicor was not dissolved as a result of the transactions, and that Respironics has done nothing to make use of the Helicor intellectual property to develop, market, or sell any products.  Id. at ¶ 16-19; Def.'s Memo. Supp. Mot. Summ. J. at 22.

Pirrotti, however, argues that issues of material fact exist as to these claims, which issues preclude summary judgment.  The court turns to the four factors enumerated above.

Confusingly, Pirrotti appears to argue that two merger events occurred, first in 2007 when Respironics made its initial investment in Helicor and an individual named David Motley was appointed to Helicor's board of directors and, second, in 2009, when Respironics purchased Helicor's intellectual property at auction.  Pirrotti is not clear about which events she asserts constituted the de facto merger.  See Pl.'s Memo. Opp. Mot. Summ. J. at 29 ("Further, there was a merger when this defendant insisted that

David Motley, their Senior management Employee, would have to be appointed to Helicor's Board of Directors, causing him to breach his fiduciary duty to the shareholders of Helicor."); id. at 31 (referring to the 2009 purchase of Lot 2: "Helicor and Respironics merged, as Helicor was absorbed by Respironics, which retained Respironics' own name and corporate identity with Helicor's intellectual property added on to its previous holdings, franchise of Helicor's name and of rights to market StressEraser, and the powers of a merged corporation to use Helicor's name and product, as it does to this very day."). Accordingly, the court must analyze, under the four-factor test, first for the 2007 initial investment and second, for the 2009 asset purchase.

a. 2007 "Merger"

The first factor concerns continuity of enterprise. There is no dispute that, in 2007, Respironics and Helicor never shared office space and that Respironics was never under the control of Helicor's management. Pirrotti, however, argues that there was, in fact, a "continuity of management" because a representative of Philips, David Motley, was appointed to Helicor's board of directors and "orchestrat[ed]" Helicor's business decisions from July 3, 2007, to February 18, 2009. See Pl.'s Memo. Opp. Mot. Summ. J. at 15. Pirrotti cites a 2007 Stockholders Agreement between Helicor and a group of investors that included in Article II (governing the election of the board of directors of Helicor) a provision stating that among the persons to be elected to the board are: "One (1) person designated by Respironics, Inc. ('the Respironics Designee'), which individually shall be David Motley, for so long as Respironics, Inc. continues to own beneficially at least 5% of the shares of Common Stock of the

Company." Pirrotti has also produced evidence in the form of a letter from Motley to the Board of Directors of Helicor resigning his position as Director. See Pl.'s Memo. Opp. Mot. Summ. J. at Ex. H. Motley signs this letter with the title of "VP, GM Philips Home Healthcare Solutions, Sleep Well Ventures." Id. Pirrotti argues that this is relevant for purposes of finding a de facto merger under the first factor because Respironics and Philips themselves had merged, meaning that Respironics was effectively installing one of its own on the Helicor board, and that management of the two companies had become entwined. See Pl.'s Memo. Opp. Mot. Summ. J. at 9 ("[Respironics] had no legally independent existence except as a subsidiary of Philips."); see also Plaintiff's Motion for Reconsideration of Order on Motion for Protective Order, Exhibit C (Doc. No. 67-4) (press release from Philips dated December 21, 2007 stating "RESPIRONICS, INC. (NASDAQ/NMS SYMBOL: RESP) today announced it has entered into a definitive merger agreement pursuant to which Royal Philips Electronics . . . will commence a tender offer to acquire all of the outstanding shares of Respironics for USD 66.00 in cash per share, or a total purchase price of approximately USD 5.1 billion.").

Pirrotti, however, has failed to produce any evidence that the 2007 investment in Helicor and appointment of Motley constituted a de facto merger between Helicor and Respironics (or Helicor and a merged Respironics/Philips entity). Pirrotti's sole evidence that Motely "orchestrated" Helicor's business activities is a vote to authorize the $400,000 loan from Respironics to Helicor. Pirrotti further asserts, without explanation and while presumably referring to the 2007 Stockholder's Agreement, that "All of the terms and agreements show that [Respironics] dominated, controlled and manipulated all of the actions taken by Helicor." See Pl.'s Memo. Opp. Mot. Summ. J.

at 29.  However, other than the Stockholder's Agreement that does not evidence this, Pirrotti offers no documentary or other support for this assertion.[3]

There is, further, no evidence that Helicor in any way altered its business practices as a result of the supposed 2007 "merger."  No evidence was put forth regarding movement or use of Helicor's assets, alteration of office location, or transfer of employees.  Indeed, Pirrotti does not allege, let alone provide evidence, that Respironics actually acquired any of Helicor's assets in 2007.  Turing to the other factors, it does not appear that Pirrotti argues that Helicor ceased its business operations in any way, or that Respironics (or Philips) assumed Helicor's liabilities.  See Call Ctr. Tech., Inc. v. Grand Adventures Tour & Travel Publ'g Corp., 635 F.3d 48, 54-55 (2d Cir. 2011) (vacating grant of summary judgment as to successor liability where members of company that transferred assets to receiving company ended up in senior management positions in receiving company, a majority of transferring company employees went to work for receiving company, companies operated out of the same office building, receiving company gave discounts to transferring company's customers, receiving company provided some of the same services as transferring company, and receiving company was formed for the specific purpose of obtaining transferring company's assets).  Indeed, the $400,000 loan was an added liability, not one assumed by Respironics.  Even assuming, arguendo, that Respironics and Philips were indeed one corporate entity at the time of the 2007 investment by Respironics in Helicor (a situation that is unlikely because Philips had yet to purchase Respironics' stock), no

---

[3] Pirrotti's complaints that she was denied discovery of this crucial evidence was more properly addressed in her various Motions to Compel, which were addressed fully by this court and the Magistrate Judge.  Discovery in this case is now complete.  Further, Pirrotti has failed to submit an affidavit explaining why further discovery is necessary, as required by Fed. R. Civ. P. 56(f).

reasonable jury could conclude that the mere presence of Motley on Helicor's board of directors constituted a <u>de factor</u> merger between Respironics and Helicor.

### b.  2009 "Merger"

Pirrotti next argues that the events following the auction sale of Helicor's assets constituted a <u>de facto</u> merger.  Pirrotti asserts that Respironics' purchase of Helicor's intellectual property led to the effective absorption of Helicor by Respironics, "leaving nothing left which resulted in Helicor's discontinuance of doing business."  Pl.'s Memo. Opp. Mot. Summ. J. at 30.  Pirrotti further alleges that the merger also involved the "absorption" of Kristin Gile, a "Senior Quality Engineer", who Pirrotti states was employed by Respironics from July 2004 to September 2007, employed by Helicor from 2007 to October 2008, and then employed by Philips in its Respironics division from January 2009 to June 2011.  Pirrotti further claims that Respironics continued in the business of selling the StressEraser, something Respironics denies.  <u>Id</u>. at 32.

The court reiterates, before turning once again to the four <u>de facto</u> merger factors, that the mere purchase of assets by a second company, even the purchase of all such assets, does not in and of itself make the purchasing corporation liable as a successor.  <u>Ricciardello</u>, 717 F.Supp. at 57-58.

Turning to the factors, this court concludes that no issues of material fact exist as to whether this 2009 asset purchase constituted a <u>de facto</u> merger.  While Respironics indeed purchased Helicor's intellectual property, Pirrotti has produced no evidence that Respironics has used that intellectual property in any way or is involved in the continuing sale or manufacture of StressEraser products.  Indeed, Pirrotti appears to concede as much: "Every discovery demand made to this defendant to discover the

future sales that were made by the defendant and/or its parent to determine what happened to the Intellectual Property that were transferred as a result of the sale were stonewalled." Pl.'s Memo. Opp. Mot. Summ. J. at 32. Such an assertion is no defense to the lack of production of evidence on summary judgment. Discovery is closed, and Pirrotti's efforts to compel production of certain evidence have all been resolved. While Pirrotti may be frustrated by her inability to access documents she may believe exist, the time for fighting for the production of such documents has passed.

Further, closer examination of the evidence Pirrotti does cite to support her claims that Respironics is in some way involved with the continuing use or sale of StressEraser yields no support for this claim. The only potentially relevant testimony is that of Pirrotti herself in her deposition:

> Pirotti: Do I have facts to support my claim that Respironics is generating revenue from the sale of StressEraser? Is that what the question was?
>
> Q: Yes.
>
> Pirotti: So my response to that is that Helicor is in the sales process of the StressEraser. So my claim would be through deductive reasoning that Respironics may be benefitting from the sales of the physical assets of the StressEraser.

Id. at Ex. E, P. 144. Such testimony does not create an issue of material fact that Respironics continued the general enterprise of Helicor. Further, as established earlier, there is no evidence that Respironics adopted any of Helicor's business practices or that the two shared a physical location. Pirrotti does claim that a single employee, apparently identified via a social networking website, toggled between Helicor and Respironics. However, Pirrotti has offered no explanation of what this employee did at the respective corporations. Further, the hiring of a single employee is a far cry from

the hiring of a majority of employees that raised an inference of a substantial continuity of employment found in <u>Call Center Technologies</u>.  Finally, Pirrotti has produced no evidence that could support the conclusion that Respironics assumed the liabilities of Helicor.  Accordingly, the evidence offered by Pirrotti is simply insufficient to raise an issue of material fact as to whether Respironics and Helicor engaged in a <u>de facto</u> merger.

      2.  "Mere Continuation"

Pirrotti next argues that a material issue of fact exists as to whether Respironics is liable as a successor to Helicor because Respironics is a "mere continuation" of Helicor.

Courts examining the issue of successor liability have observed that the "<u>de facto</u> merger" doctrine and the "mere continuation" doctrine have substantial overlap and are often treated together.  "For the purposes of determining successor liability, analysis of a 'mere continuation' and a '<u>de facto</u> merger' may be treated together."  <u>Collins v. Olin Corp.</u>, 434 F.Supp.2d 97, 103 (D. Conn. 2006) (citing <u>Peglar v. Professional Indemnity Underwriters Corp.</u>, No. X05CV970160824S, 2002 WL 1610037, at *6-7 (Conn. Super. Ct. June 19, 2002)).  Connecticut courts generally evaluate a "mere continuation" theory under the rubric of whether there was a "continuity of enterprise" (as opposed to a strict focus on continuity of ownership).  <u>See</u> <u>Call Ctr. Tech.</u>, 635 F.3d at 53; <u>Medina v. Unlimited Sys., LLC</u>, 760 F.Supp.2d 263, 270 (D. Conn. 2010) ("Connecticut courts treat 'continuity of enterprise' as their preferred version of the 'mere continuation' exception, essentially defining 'mere continuation' as 'continuity of enterprise.'").  Under this theory, "'successor liability attaches where the successor maintains the same business, with

the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers.'"  Id. (quoting Kendall v. Amster, 108 Conn. App. 319, 332 (2008).  The court notes that "'The issue[ ] of whether a purchaser is a mere continuation of the selling corporation is a question of fact.'"  Id. (quoting Chamlink Corp. v. Merritt Extruder Corp., 96 Conn. App. 183, 187 (2006).

For reasons identical to those outlined in its discussion of de facto merger, supra at section IV-A-1, the court concludes that no issues of material fact exist as to whether Respironics was a mere continuation of Helicor.[4]

3.  Fraudulent Transfer

Respironics next asserts that it should be granted summary judgment because no disputed material facts exist as to whether the transfer of assets from Helicor was fraudulent and made with the intent to impair the rights of Helicor's creditors, including Pirrotti.  "The fourth exception to successor non-liability, which applies to fraudulent transactions, imposes liability where a sale or merger is entered into for the fraudulent purpose of escaping liability for the seller/debtor's obligations."  Greystone, 638 F.Supp.2d at 291.  "By statute . . . Connecticut . . . law provide[s] that any conveyance or assignment of real or personal property made with the intent to disturb, delay, hinder

---

[4] This analysis likewise applies to a supposed alternative test, which Pirrotti labels the "substantial continuity test" used in some employment cases.  See Battino v. Cornelia Fifth Avenue, LLC, 861 F.Supp.2d 392, 404 (S.D.N.Y. 2012) ("The substantial continuity test in the labor relations context looks to whether the new company has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.") (internal quotations omitted).  As discussed above, Pirrotti has come forward with no evidence upon which a reasonable jury could find that Respironics made any use of Helicor's assets, much less that it continued without substantial change, Helicor's business operations.

or defraud creditors is void as against such creditors." Id. (citing Conn. Gen. Stat. § 52-552e.

Under the fourth basis for successor liability, Connecticut General Statutes section 52-552e provides two theories that are available to a creditor to prove fraudulent conveyance. First, a creditor may prove that the transfer was made with actual intent to defraud. See Conn. Gen. Stat. § 52-552e(a)(1). Second, a creditor may prove that the debtor did not receive "a reasonably equivalent value in exchange for the transfer." Id. A creditor may succeed by proving either theory. See Chemical Bank v. Dana, 234 B.R. 585, 592 (D. Conn. 1999).

Pirrotti argues that issues of material fact exist as to this fraudulent transfer theory for essentially two reasons: first, that the $400,000 loan that gave rise to the asset auction was fraudulent because Motley was not authorized to vote to approve the loan; and second, that the low sales price paid for Helicor's assets (in particular Lot 1, but also Lot 2) was not reasonably equivalent to the value of the assets themselves.

Respironics disputes these assertions. As a threshold matter, Respironics contends that the contents of Lot 1 and Lot 2 do not qualify as "assets" under section 52-552e because they were subject to a perfected security interest that exceeded the value of their contents, and that this fourth basis of successor liability is simply inapplicable to the transfer at issue here. Next, Respironics contends that no evidence of fraudulent intent exists, and that the amounts paid for the two Lots were reasonable because they were conducted at a public auction.

a.  "Assets" Under Section 52-552

Under Connecticut's Fraudulent Transfer Act, section 52-552a et seq., a

"transfer" "means every mode, direct or indirect, absolute or conditional, voluntary or

involuntary, of disposing of or parting with an asset or an interest in an asset, and

includes payment of money, release, lease and creation of a lien or other

encumbrance."  Conn. Gen. Stat. § 52-552b(12).   An "asset" "means property of a

debtor, but the term does not include: (A) Property to the extent it is encumbered by a

valid lien."  Conn. Gen. Stat. § 52-552b(2).  Respironics argues that the security interest

it held against Helicor as a result of the $400,000 loan exceeded the value of the

property sold at auction, making the substance of Lot 1 and Lot 2 not "assets" for

purposes of the statute.  See Nat'l Loan Investors, L.P. v. World Prop., LLC, 79 Conn.

App. 725, 732 (2003) ("[A] transfer cannot be considered fraudulent if, at the time of the

transfer, the transferred property is encumbered by valid liens exceeding the property's

value because the property would no longer be considered an asset under § 52-

552(b)(2), and only assets may be transferred fraudulently.") (citing Dietter v. Dietter, 54

Conn. App. 481, 494 (1999)); see also Epperson v. Entm't Express, Inc., 338 F.Supp.2d

328, 342 (D. Conn. 2004) ("[I]f there is a 'valid lien' on property that exceeds the value

of the property, the property cannot be considered an 'asset,' and there can be no

17

'transfer' under the [Uniform Fraudulent Transfer Act].").[5]

Respironics asserts that it held a perfected security interest as a result of the loan it made to Helicor.  See Def.'s 56(a)(1) at ¶ 1-5.  Pirrotti does not deny that Respironics went through the steps necessary to obtain a security interest on the original loan and file attendant financing statements with the Delaware Department of State to perfect that loan.[6]  See Pl.'s 56(a)(2) at ¶ 3, 4.   Instead, Pirrotti argues that the loan itself was invalid, presumably thereby nullifying the security interest that led to the property sale and eliminating the protection offered against the fraudulent transfer claim by the fact that the property in question was encumbered by a security interest.

Pirrotti argues that, under Delaware law, Helicor was only permitted to approve contracts, such as the $400,000 loan with Respironics, pursuant to a majority vote of disinterested members of its Board of Directors.  See Pl.'s Memo. Opp. Mot. Summ. J. at 26 (citing 8 Del. C. § 144 (a)(1) (which provides that no contract or transaction between a corporation and another corporation shall be voidable if, "The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the

---

[5] The court notes that in Jacobwitz v. Jacobwitz, the Appellate Court of Connecticut, in a footnote, observed, somewhat cryptically, that a citation to Dietter by the defendants in that case was "inapposite" to a claim that a transfer cannot be considered fraudulent if the transferred property was encumbered by valid liens exceeding the property's value.  Jacobwitz v. Jacobwitz, 102 Conn. App. 332, 334 n.1 (2007).  However, the court declined to take up the issue because it had been inadequately briefed and did not explain whether the underlying proposition regarding whether such a transfer could be considered fraudulent lacked a basis in law or why the Dietter citation was inappropriate.  Given the clear wording of Nat'l Loan Investors, 79 Conn. App. at 732, this court sees no reason to attribute significance to the Jacobwitz decision beyond that case.

[6] The parties appear to agree that Helicor and Respironics were organized under the laws of the state of Delaware and that Delaware law governs the issues of the validity of the lien. See Def.'s Memo. Supp. Mot. Summ. J. at 15 n. 18; Pl.'s Memo. Opp. Mot. Summ. J. at 26.

affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum.")).  Pirrotti argues that, because Motley was an <u>interested</u> party (as a representative of Respironics and Philips), his vote was invalid.  Further, Pirrotti argues that the loan approval document is itself invalid because it represents Motley as a <u>disinterested</u> party, when he was not.  <u>See</u> Pl.'s Memo. Opp. Mot. Summ. J. at 27.  In support, Pirrotti cites a document entitled "Written Consent of the Board of Directors of Helicor, Inc." relating to the consent to convertible debt.  The document states:

> WHEREAS, all interested directors are required to disclose to the Board, in accordance with Section 144(a) of the DGCL, all material facts as to such interested director's interest in the proposed Transaction;
> WHEREAS, Mr. Forbes and Mr. Samara have disclosed to the Board all material facts as to his interest in the proposed transaction and that each such director will purchase a Convertible Note in an amount equal to $100,000.00;
> WHEREAS, for the purpose of voting on any matter brought before the Board in connection with the Convertible Securities, the Board has 3 disinterested directors, which represent a majority of all directors of the Board, it is:
> NOW, THEREFORE, BE IT RESOLVED, that the Corporation be and hereby is authorized to borrow funds through the issuance of Convertible Notes.

<u>See</u> Pl.'s Memo. Opp. Mot. Summ. J., Ex. Q.

Respironics offers three arguments in response to Pirrotti.  First, Respironics argues that Pirrotti lacks standing to challenge the underlying loan.  Second, Respironics argues that issues related to the authorization of the initial loan are simply irrelevant to the issue of successor liability.  Third, Respironics argues that Helicor's Board of Directors were at all times aware of Motley's connection to Respironics and that, even if Motley's vote was disqualified, the approval of the loan was still valid.  <u>See</u> Defendant's Reply In Support of Motion For Summary Judgment ("Def.'s Reply") (Doc. No. 153) at 3-4.

In the oral argument that preceded its Ruling on Pirrotti's Motion for Summary

Judgment, this court questioned Pirrotti's counsel as to these first two arguments:

> THE COURT: Unless you are a shareholder of the company, I don't know what it matters that they didn't have the right people vote or the wrong people voted or people had interest.

> MR. PIRROTTI: You can't vote.  There's no basis for the transfer.

> THE COURT:  How is that relevant to your claim?

> MR. PIRROTTI:  It is relevant then you clearly show the issue, Judge, that in terms of the transfer, there was no transfer for anyone.

> THE COURT:  That isn't the transfer, that's the loan.  That wasn't the transfer.

> MR. PIRROTTI:  It is not a loan.  That's my point.  I'm sorry I'm not able to convey that to you, Judge.  There's no duty to repay.  If a stockholder should come up and say excuse me, Helicor board did not act properly, there wasn't a majority vote as required by the bylaws and the general corporation.

> THE COURT:  In Connecticut, we still have a theory in common law known as money had[] [and] received so no matter how illegal that loan might have been, the person who gave them the loan couldn't still sue them for money had[] [and] received.

> MR. PIRROTTI:  Not when you commit fraud.  There's no basis for the perpetrator of the fraud and the perpetrator of the fraud in this case is Respironics.  There's no basis in law, most respectfully, for them to turn around after they are party to the fraud and say excuse me, I want a value.  There's not a chance in this world, your Honor, that that could ever happen.

See Pl.'s Summ. J. Ruling at 15-16.  Pirrotti adds nothing to these arguments here, cites

no case law in support of her position, and adheres to the assertion that the loan was

invalid, rendering all subsequent actions to secure and perfect a security interest

irrelevant.  Pirrotti, as a creditor and not a shareholder, does not appear to have

standing, in the first instance, to challenge the validity of the underlying loan.  See, e.g.,

N. American Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A. 2d 92, 103

(Del. 2007) (holding that creditors of an insolvent corporation have no right to assert

direct claims for breach of fiduciary duty against corporate directors or solvent or insolvent corporations, but may bring derivative claims against insolvent corporations). It is at most a voidable contract, but it is not void.  Pirrotti has no standing in this action to seek to void this arguably voidable contract.[7]

Respironics further argues that, even accepting that Pirrotti can challenge the validity of the underlying loan based on Motley's vote, there is no evidence that the vote authorizing the loan was invalid under 8 Del. C. §144.  The court notes that Motley's connection to Respironics was not a mystery to Helicor or its shareholders.  Indeed, the 2007 Helicor Stockholder's Agreement cited by Pirrotti as evidence of Respironics' de facto merger with Helicor explicitly refers to Motley in Article II of the Agreement, relating to the election of the Board of Directors.  See Pl.'s Memo. Opp. Mot. Summ. J. at Ex. O ("[T]he following persons shall be elected to the Board: (a) One (1) person designated by Respironics, Inc. (the "Respironics" designee) which individual shall initially be David Motley, for so long as Respironics, Inc. continues to own beneficially at least 5% of the shares of Common Stock of the Company (including shares of Common Stock issued or issuable upon conversion of Series A Preferred Stock").  It is therefore hard to argue that Helicor was unaware of Motley's potential interests or that he somehow perpetuated a fraud upon the board.

However, the court is less certain that, even without Motley's vote, the loan would have been approved in accordance with Delaware law.  Respironics argues that a remaining member of the Helicor Board of Directors, Bruce Robb, was both disinterested (a point Pirrotti does not contest) and that his vote alone sufficient to

---

[7] Pirrotti has not brought a derivative claim against the Board of Directors to void the contract.

approve the loan.  See 8 Del. C. § 144 (allowing approval of a contract when "the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum).  Were Helicor's Board of Directors composed of four individuals, Respironics' argument would be persuasive.  However, neither party accounts for the non-vote of a fifth board member whose name appears on the witness signature page for the loan approval signed by Bruce Robb.  See Pl.'s Memo. Opp. Mot. Summ. J., Ex. Q, at 1(page marked RESP00001074) (identifying "3" disinterested directors after specifically identifying two other directors as interested, leading to a total of five directors); Pl.'s Memo. Opp. Mot. Summ. J., Ex. O at 7 (Helicor's Shareholder's Agreement stating that "the size of the Board [of Directors] shall be set and remain at five (5) directors").[8]  As such, approval of a "majority" of remaining disinterested board members is unclear – one vote, Mr. Robb's, was in favor, while one vote remains unaccounted for.

However, even if the loan would not have been approved originally had Motley been excluded from the vote (the propriety of which this court does not pass on), Pirrotti's challenge to the underlying loan -- to which she was not a party, and for which

---

[8] The court notes that Pirrotti's attached copy of the debt consent contract confusingly contains four signature pages, three of which are marked as page number five and one of which contains an extra line for Michael Wood.  Pirrotti offers no explanation for these discrepancies.

she has introduced no evidence that she was a shareholder with relevant voting rights[9] – is simply irrelevant to a challenge to the 2009 asset sale as a fraudulent transfer made for the purposes of escaping creditors.  The loan itself certainly was not a "fraudulent transfer" meant to impair the rights of either Helicor or Respironics' creditors; indeed, Respironics was becoming a creditor as a result of the loan and there is nothing in the record to suggest that anyone owed debts by Helicor would suffer because of the infusion of money.  There is no dispute that money actually changed hands from Respironics to Helicor, although the parties dispute whether that loan was proper.

However, even if Respironics maintained a valid, perfected security interest in the Helicor debt, it still must show that the value of that security interest exceeded the value of the property transferred in order to show that the property in question was not an "asset" for purposes of the fraudulent transfer statute.  See Epperson, 338 F.Supp.2d at 342.

Respironics supports this claim in two ways.  First, Respironics argues that the value of the property sold at auction following Helicor's default was reasonably equivalent to the value of Respironic's security interest, which it values at $435,000 based on the original $400,000 loan.  See Def.'s Memo. Supp. Mot. Summ. J. at 17. Second, it asserts that the only extant piece of documentary evidence that could show

---

[9] Pirrotti claims that she held warrants to shares in Helicor, not actual shares.  See Pl.'s Memo. Opp. Mot. Summ. J. at 28.  "A warrant is generally a certificate entitling the owner to buy a specified number of shares at a specified time(s) for a specified price.  Essentially, a warrant is a contract that locks in terms by which the holder may buy stock in a company.  A warrant holder is not, however, a stockholder; she has not yet made an investment in the company entitling and exposing her to the benefits and risks of stock ownership."  In re New Valley Corp. Derivative Litigation, No. C.A. 17649-NC, 2004 WL 1700530, *4 (Del. Ch. June 28, 2004) (unpublished).  There is no evidence that these warrants carried with them any voting rights or notification requirements beyond an option for future purchase, and there is no warrant agreement in evidence that would explain whether Pirrotti's warrants carried special rights.

what the parties believed the property to be worth prior to the sale, an "Asset List" prepared prior to the public sale, values the Helicor property at less than the amount of the outstanding security interest.  See id. at Ex. H.  According to Respironics, this further shows that the property is not somehow worth more than the amount it sold for at auction.

Pirrotti, as discussed and dismissed above, supra at section IV-A-3-a, asserts that the security interest was not in fact worth anything because the underlying loan giving rise to the security interest was invalid.  Next, and more relevant here, Pirrotti asserts that the sale price at the 2009 auction is not an adequate estimate of the value of the property at issue because the auction itself was not open to the public or subject to competitive bidding.  Pirrotti also argues that the true value of the assets far exceeded that obtained at auction, a claim based upon her own affidavit testimony as an "expert," the extrapolated valuation of Helicor based on Respironics' initial investment in the company, and internal documents from Respironics from 2007 projecting a high value for Helicor's assets.  It is not disputed that Lot 1 was sold to a third company, Western Cape, for $100, and that Lot 2 was sold to Respironics for the outstanding balance due under the 2008 note.  See Def.'s Memo. Supp. Mot. Summ. J. at 8; Pl.'s Memo. Opp. Mot. Summ. J. at 22.

Whether the value of Helicor's property exceeded the value of Respironics' security interest depends in large part on whether the sales price elicited at the 2009 auction is itself a reliable measure of the property's value.  "[A]n arms length transaction – the so-called 'willing buyer-willing seller' test – is the best evidence of (and often the

24

easiest method to determined) fair market value."  Boyce v. Soundview Tech. Grp., Inc., 464 F.3d 376, 387 (2d Cir. 2006).

The court notes, before engaging in its analysis of whether the auction established the fair market value of the property in question, that Pirrotti's other attempts to establish some other, greater value for the property in question are insufficient as a matter of law.  Principally, Pirrotti cites her own testimony stating that the physical StressEraser products sold in Lot 1 for $100, were actually worth over $1 million, based on the number of units and the retail price for individual StressErasers allegedly used at the time.[10]  See Pl.'s Memo. Opp. Mot. Summ. J., Pirrotti Aff. at ¶ 20. She also cites herself for the proposition that Lot 2 was worth $40-50 million.  Id., at Pirrotti Aff. at ¶ 14.  These valuations are based on her "opinion" as a marketing expert and former employee.  Id., at Pirrotti Aff. at ¶ 3, 16.  Pirrotti was never disclosed as an expert witness, and this valuation testimony is barred under the Federal Rules of Civil Procedure.  See  Fed. R. Civ. P. 37(c)(1).

Next, Pirrotti cites two proposals from 2007 outlining a $4 million investment of Respironics in Helicor.  These proposals include, under the heading "Valuation" a statement that "Respironics' forecast estimates a value of roughly" 40 or 50 million dollars."  See Pl.'s Memo. Opp. Mot. Summ. J., Ex. L.  As this court observed in connection with its Ruling on Pirrotti's Motion for Summary Judgment, this valuation estimate is irrelevant to determining value at the time of sale.  See Pl.'s Summ. J. Ruling at 39 ("[T]he plaintiff has come forward with no evidence as to the value of the

---

[10] This "analysis" ignores the costs necessary to be expended to achieve this "value."

assets on the date of the sale."). As such, the court is left with little evidence as to the value of the property at the time of sale.

Respironics maintains that, because the auction of Helicor's assets took place in the form of an arm's length transaction, the actual sales price is a reliable indicator of the value of the property, a value that happened to be less than the value of Respironics' security interest. In support, Respironics offers the Affidavit of Attorney Shriber, that Helicor was notified that its assets would be sold at a public sale, that Respironics searched for Helicor's creditors and sent approximately thirteen notices of disposition of collateral to those creditors, that Respironics ran two advertisements in the New York Observer newspaper (on May 20, 2009, and June 10, 2009) notifying the public about the sale, that Respironics retained a law firm to conduct the public sale, and that anyone who wished to participate in the sale was permitted to do so, either in person or by telephone. See Def.'s 56(a)(1) at ¶ 8, 10-14; Def.'s Memo. Supp. Mot. Summ. J. at Ex. 2, Ken Newman Aff., Ex. A-B. Respironics asserts that five people participated in the actual auction: Attorney Shriber on behalf of Respironics, Adam Forbes, Peter Ellman of Western Cape, Matthew Clark, and Adam DiNardo. Id. at ¶ 16.

Pirrotti disputes these facts, arguing that the sale was in fact closed to the public, and that insiders engaged in non-competitive bidding.[11] Pl.'s Memo. Opp. Mot. Summ. J. at 34-37. It is undisputed that Lot 1 and Lot 2 received only one bid each. Lot 1 was purchased for $100 by Western Cape, and Lot 2 was purchased for the remainder of

_____

[11] Pirrotti also claims that notice was insufficient in that she herself did not receive notice of the sale. However, she has not produced evidence that she was entitled to such notice as a shareholder or creditor (she became a judgment creditor of Helicor on August 28, 2009, more than two months after the sale, and she has cited no law for the proposition that, as a holder of a "warrant" for the purchase of Helicor stock, she was entitled to such notice.). See 6 Del. C. § 9-611(c).

the security interest by Respironics itself.  Pirrotti further asserts that Adam Forbes, the CEO of Helicor, was involved in the founding of Western Cape, which purchased Lot 1. See Pl.'s Memo. Opp. Mot. Summ. J., Pirrotti Aff. at ¶ 25.

Pirrotti points to case law governing private collateral sales, which suggests that sparse attendance and a lack of competitive bids (which she argues characterize the 2009 sale) create a genuine issue of material fact as to whether the sale was commercially reasonable.  See Hicklin v. Onyx Acceptance Corp., 970 A. 2d 244, 252-53 (Del. 2009) ("[T]he sale of a car to the highest bidder at a poorly publicized, sparsely attended, and inconveniently located auction would not be meaningful; but a sale to the highest bidder at a highly-publicized, well-attended auction run by a highly regarded auctioneer in a convenient location would be.").  The court also notes that, under Delaware law, "The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner."  6 Del. C. § 9-627(a).  Further, the court is mindful that, "Commercial reasonableness is normally a question of fact."  Addessi v. Wilmington Trust Co., 530 A. 2d 1128, *3 (Del. 1987) (unpublished).

Respironics argues that its efforts to publicize the event are sufficient as a matter of law to justify its label as a "public sale."  Respironics cites a single case for the proposition, interpreting a similar rule under New York law.  See Orix Credit Alliance, Inc. v. Blevins, No. 90 Civ. 5759(SS), 1993 WL 177940 (S.D.N.Y. 1993) ("A careful review of the record reveals that Orix' public sale of A.H.E. Express' trucks was

commercially reasonable as a matter of law.  The trucks were sold at a public sale; defendants received proper notice of the sale; the sale was advertised twice in a newspaper of general circulation in the location where the sale was conducted as well as in a newspaper of general circulation where the defendants live; and the sale notice set out the day, time and place as well as the collateral and terms of the sale.").

Beyond discussion of the two newspaper advertisements, Respironics has not introduced evidence of other indices of commercial reasonableness that could show that the procedures it followed were sufficient.  For example, Respironics has not shown that its procedures were in conformity with accepted advertising trade practices when conducting sales like the one at issue here.  While this additional showing is not required under the UCC, it certainly deprives the court of a comparative means of assessing commercial reasonableness here and prevents the sale from falling under one of the UCC's "safe harbor" provisions.  See 6 Del. C. § 9-627(b).

The court further notes the inherent difficulty in reasoning, one way or another, from the sales price for particular property as to whether that price was commercially reasonable.  A small number of buyers and a low sales price could be an indication of an insufficiently public sale, or a simple lack of public interest and demand.  This assessment is made even more difficult by the absence of relevant, timely valuations of the assets value at the time of the sale.  See Hicklin, 970 A. 2d at 251 ("It is improper to reason backwards from price alone to determine the commercial reasonableness of the overall sales process.").

Drawing all inferences in Pirrotti's favor, as this court must on Summary Judgment, the relative lack of advertising, the absence of competitive bids, the absence

of outside attendees, and the purchase of Lot 2 by the entity that convened the sale in the first place raises an issue of material fact as to whether the sale was commercially reasonable and, for present purposes, established the fair market value of the property sufficient to demonstrate that the value of the property did not exceeded the value of the security interest.

However, Respironics contends that a second, separate means exists for determining that the value of the property sold did not exceed the security interest.  It points to an "Asset List" submitted by Helicor to Respironics in anticipation of the sale on May 7, 2009.  See Def.'s Memo. Supp. Mot. Summ. J. at 17; Shriber Aff. at ¶ 9; Ex. H.  This list, dated as of May 7, 2009, lists, among other things, a value of "Intangible Assets" at $344,145, a value of new and used inventory at a combined $82,276.70, "Cash in bank" at $47,807, "Accounts receivable" at a combined $36,604, a value of "Prepaid parts" at $447,824 (along with a note indicating that these funds are deposits subject to forfeiture because of an outstanding debt of $705,554.40.).

Pirrotti argues that the Asset List is inadmissible hearsay evidence.  See Pl.'s Memo. Opp. Mot. Summ. J. at 24; Plaintiff's Motion to Strike Various Exhibits (Doc. No. 152) at 1-6.  Pirrotti argues that the list is hearsay because it is offered for the truth of the matter asserted, namely, the fair market value of Helicor's assets.  Respironics contends that "the Asset List" is not hearsay, as it is admissible not to prove that it identifies the actual value of the assets, but to prove Respironics' perception or belief about the assets' value around the time of the June 15, 2009 public sale."  See Defendant's Opposition to Plaintiff's Motion to Strike (Doc. No. 155).  Respironics, in other words, concedes that the Asset List is not evidence of the actual value of the

29

property in question.  It is unclear what relevance Respironics' perception of the value of the property would have for determining whether the value of the assets did, in fact, exceed the value of the security interest.  Accordingly, the Asset List does not provide an alternative avenue for establishing the value of the property.

Because a material issue of fact remains as to whether the value of the property exceeded the value of the security interest, the court cannot say that the property did not qualify as an "asset" under the Fraudulent Transfer Act.

b.  Actual Intent to Defraud

Determining that a material issue of fact exists as to whether the property sold at auction were "assets" within the purview of the Fraudulent Transfer Act does not end the inquiry.  The court must next assess whether Pirrotti has raised an issue of material fact as to the fraudulent transfer itself.  Turning to the first test, the court examines whether an issue of material fact exists as to whether Respironics had an actual intent to defraud creditors by engaging in the sale.  <u>See</u> Conn. Gen. Stat. § 52-552e(a)(1).

To the extent this court can determine, Pirrotti does not appear to assert that Respironics exhibited actual intent to defraud other than to exhibit "bad faith" by failing to notify Pirrotti of the default of the original $400,000 loan, that multiple creditors were not notified of the disposition of collateral, that Respironics sold Lot 2 to itself, and that Respironics' counsel served as "referee" of the property auction and thereby engaged in a conflict of interest.  <u>See</u> Def.'s Memo. Supp. Mot. Summ. J. at 36-37.  Pirrotti has cited no case law to support the conclusion that such assertions are sufficient to create an issue of material fact as to Respironics' actual intent to defraud.

This evidence is simply insufficient to create a material issue of fact as to Respironics' intent to defraud.  Respironics has not been shown to have been required to notify Pirrotti, and Pirrotti's objections to the form of the property auction are more appropriately directed to the question of whether the sale itself was commercially reasonable.  Even drawing all inferences in Pirrotti's favor, she has not raised an issue of material fact as to Respironics' actual intent to defraud.

        c.  Constructive Fraud

A creditor may also prove a fraudulent conveyance by showing that the conveyance was made "without receiving a reasonably equivalent value in exchange for the transfer or obligation."  Greystone, 638 F.Supp.2d at 292 (internal quotations and citations omitted).  To prove a fraudulent transfer claim under a constructive fraud theory, section 52-552e(a)(2) requires that a creditor demonstrate that her claim arose before the transfer occurred and that the debtor made a transfer without receiving reasonable compensation.  In addition, the creditor must show either that "the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or that the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  See Conn. Gen. Stat. § 52-552e(a)(2).

The court notes that Pirrotti filed her suit against Helicor on February 6, 2009. The disputed sale of Helicor assets occurred on June 15, 2009.  Pirrotti obtained her judgment against Helicor on August 28, 2009.  There is some question as to whether Pirrotti's claim against Helicor can be said to have arisen prior to the transaction, as she had filed her suit but had not yet actually become a creditor.  Under section 552(b), a

"claim" is defined as "a right to a payment, <u>whether or not the right is reduced to judgment</u>, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."  Conn. Gen. Stat. § 52-552(b).  "[A] creditor can recover under this statute for a claim that has not yet been adjudicated.  The operative standard is whether the creditor has a right to repayment."  <u>Final Cut, LLC v. Sharkey</u>, No. X05CV085007365S, 2012 WL 310752, *10 (Conn. Super. Jan. 3, 2012) (emphasis added).  The statute appears to include Pirrotti's pending lawsuit within the definition of "claim."

However, even if the inclusion of pending lawsuits within the definition of "claim" were not clear, at least some Connecticut courts have implicitly found that the statute contemplates "claims" as including filed, but not yet adjudicated, lawsuits.  <u>See</u> <u>Hamrah v. Emerson</u>, No. CV054012872, 2009 WL 2963281, *6 (Conn. Super. Aug. 20, 2009) (considering a transfer that occurred following a trial but before a tentative decision was issued and determining that "[a] claim existed in the nature of the California lawsuit, before the property transfer and the disposal of the proceeds.").  <u>See</u> <u>also</u> <u>Final Cut</u>, 2012 WL 310752 at *24 ("The Transfers were made after [the defendants] knew or should have known of the plaintiff's claims against them.  Many Transfers were made after the plaintiff had commenced this litigation against the defendants, and even after the court had issued orders for the attachment of [defendants'] assets.  The court finds that the Transfers were made with the actual intent to hinder, delay, or defraud the creditors of the defendants, principally the plaintiff.").  The court in <u>Final Cut</u> was considering a fraudulent transfer claim under the actual intent prong, which has clearer support in the statutory language than constructive fraud.  <u>See</u> Conn. Gen. Stat. § 52-

552(e)(b) ("In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether . . . (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit").  The court determines that the expansive definition of "claim" under the statute, coupled with the support of the few Connecticut courts to consider the issue, means that Pirrotti did indeed have a claim that arose prior to the transfer at issue here.

Turning to the second prong of the constructive fraud test, the court determines that a material issue of fact exists as to whether the sale was commercially reasonable because a disputed issue exists as to whether the price obtained for the assets actually equaled or exceeded the value of those assets.  As discussed more fully above, the nature of the sale here raises issues of material fact as to the sale's commercial reasonableness.  Because of this factual issue, and because the Helicor retained no assets with which to pay remaining debt obligations following the sale, the court denies Respironics' Motion for Summary Judgment as to the constructive fraud theory.

## V.    CONCLUSION

For the foregoing reasons, Respironics' Motion for Summary Judgment (Doc. No. 126) is **denied**.  Further, Respironics' Motion to Substitute Pages (Doc. No. 143) is **granted**.  Pirrotti's Motion to Strike Exhibits is **dismissed as moot**.

**SO ORDERED.**

Dated at New Haven, Connecticut this 28th day of January, 2013.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge